# 11 CIV 3773

JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BICKEL & BREWER
William A. Brewer III (WB 4805)
Alexander D. Widell (AW 3934)
767 Fifth Avenue, 50th Floor
New York, New York 10153
(212) 489-1400



RECEIVED
JUN 02 2011
U.S.D.C. S.D. N.Y.
CASHIERS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NEW LOUISIANA HOLDINGS, LLC; FOUNTAIN VIEW
215 TENANT LLC; JACKSON MANOR 1691 TENANT
LLC; PANOLA 501 GP LLC; RETIREMENT CENTER
14686 TENANT LLC; ACADIAN 4005 TENANT LLC;
LAKEWOOD QUARTERS REHAB 8225 TENANT LLC;
REGENCY 14333 TENANT LLC; SHERWOOD 2828
TENANT LLC; LAKEWOOD QUARTERS ASSISTED
8585 TENANT LLC; PANOLA 501 PARTNERS LP;
CITISCAPE OUT PARCEL TENANT LLC; CITISCAPE
5010 TENANT LLC; ST. CHARLES 1539 TENANT LLC;
WOODLAND VILLAGE 5301 TENANT LLC; ATRIUM
6555 TENANT LLC; and HARRIS SCHWARTZBERG,

Civil Action No.:

Plaintiffs,

- v -

GE BUSINESS FINANCIAL SERVICES, INC.;
GE HEALTHCARE FINANCIAL SERVICES, INC.;
GENERAL ELECTRIC CAPITAL CORPORATION;
CIT HEALTHCARE LLC; MARATHON STRUCTURED
FINANCE FUND, L.P.; and RICHARD ARROWSMITH,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs New Louisiana Holdings, LLC; Fountain View 215 Tenant LLC; Jackson

Manor 1691 Tenant LLC; Panola 501 GP LLC; Retirement Center 14686 Tenant LLC; Acadian

4005 Tenant LLC; Lakewood Quarters Rehab 8225 Tenant LLC; Regency 14333 Tenant LLC;

Sherwood 2828 Tenant LLC; Lakewood Quarters Assisted 8585 Tenant LLC; Panola 501

Partners LP; Citiscape Out Parcel Tenant LLC; Citiscape 5010 Tenant LLC; St. Charles 1539 Tenant LLC; Woodland Village 5301 Tenant LLC; Atrium 6555 Tenant LLC; and Harris Schwartzberg (collectively, "Plaintiffs") file this Complaint against Defendants GE Business Financial Services, Inc.; GE Healthcare Financial Services, Inc.; General Electric Capital Corporation; CIT Healthcare Financial Services LLC; Marathon Structured Finance Fund, L.P.; and Richard Arrowsmith (collectively, "Defendants"), upon personal knowledge as to Plaintiffs' own actions and upon information and belief as to all other matters, as follows:

## I.

## PRELIMINARY STATEMENT

Over ninety years ago, William Howard Taft, the twenty-seventh President of the United States, proclaimed, "Anti-Semitism is a noxious weed that should be cut out. It has no place in America."[1] Unfortunately, the sad truth is that anti-Semitism continues to exist in America today. It not only exists in dark corners of our communities, but in social, financial, and educational circles as well. That anti-Semitism exists and sometimes results in discriminatory business practices is reflected in the facts of this case.

Harris Schwartzberg and his father, Albert (the "Schwartzbergs")—two successful Jewish-American businessmen have been subjected to a pattern of discrimination at the hands of Defendants through their agent—Mr. Richard Arrowsmith, a GE Business Financial Services, Inc. ("GE Financial") loan executive driven by an animosity toward the Schwartzberg family because of its Jewish ancestry.

---

[1] William Howard Taft, U.S. President, Address Before the Anti-Defamation League in Chicago, Illinois: Anti-Semitism in the U.S. (Dec. 23, 1920).

The Schwartzbergs have spent the past twenty years building a number of businesses that together comprise one of the country's most respected privately-owned providers of skilled nursing care. The secret to their success is their unrelenting desire to provide a better experience for nursing home residents. That desire drove them in late 2005 to continue the expansion of their healthcare and skilled nursing operations into Louisiana and the surrounding areas, even after Hurricane Katrina had wreaked havoc on the Louisiana economy. Thus, on January 18, 2006, the Schwartzbergs, through Plaintiff New Louisiana Holdings, LLC and its affiliates, acquired the right to operate twelve nursing and assisted living facilities in and around Louisiana.

For the next two years, the relationship between Plaintiffs and the consortium of lenders who provided a portion of the financing for that expansion proceeded without issue. However, in early 2008, the positive outlook for Plaintiffs' businesses turned negative when a subsidiary of General Electric Corporation ("General Electric") purchased Merrill Lynch Capital's ("Merrill Lynch") healthcare financing business and, with it, the lead position under the loan agreements. Once GE Financial assumed control over the loans, it assigned the account to Arrowsmith. In short order, Arrowsmith—by words and deeds—revealed the intense prejudice against the Schwartzbergs that became the hallmark of his administration of the loans at issue. In horror, Plaintiffs have been forced to contend with the wildly destructive behavior of the bigoted Arrowsmith. Unfortunately, Arrowsmith's extreme prejudice toward "rich Jews" compelled him to take actions that have caused Plaintiffs and their businesses to lose in excess of one hundred million dollars ($100,000,000). This conduct stands in sharp contrast to the carefully crafted public image presented by Arrowsmith's employer, General Electric. Although General Electric boasts that it is an organization committed to racial and ethnic diversity, its subsidiary knowingly supported Arrowsmith's discriminatory loan practices.

Apparently the product of generations of hatred for the Jewish people, Arrowsmith embarked upon a campaign to harm the Schwartzberg family and to hurt their business after he took over as the loan administrator for the Lenders. Within a few months, Arrowsmith "declared" certain technical, easily cured, non-monetary defaults. Using those manufactured defaults as his wedge, Arrowsmith pried open every aspect of Plaintiffs' businesses with the object of wrongfully diverting millions of dollars to the lenders. Driven by racial and religious animus, Arrowsmith unfairly discriminated against the Schwartzbergs and the corporate Plaintiffs while driving the healthcare facilities operated by "those people" to the brink of insolvency. As a result, Plaintiffs' businesses have sustained millions of dollars in operating losses and a substantial loss in value, damaging the reputation of the Schwartzbergs and their healthcare businesses.

Notwithstanding all that Arrowsmith and the other Defendants have done, the Schwartzberg entities never missed a payment required to be made on the loan during Arrowsmith's three-year reign. Given the gravity of Defendants' financial harassment, Plaintiffs have determined that the time had come to pursue a full public airing of the discriminatory conduct to which they were subjected and to force Defendants to pay for the substantial damages they caused.

While General Electric's Chairman and CEO, Jeffrey Immelt, receives Humanitarian Awards from The Simon Wiesenthal Center, GE Financial permitted Arrowsmith to pursue a course of conduct that is explained only by his hostility toward the Jewish ancestry of the Schwartzbergs. Because the other Defendants failed to restrain the illegal acts of their lead representative, Plaintiffs bring this lawsuit to remedy the injustices worked against them and to expose the pernicious and illegal conduct of the lenders through their lead representative.

4

## II.

## PARTIES

### A.   Plaintiffs

1.     New Louisiana Holdings, LLC ("New Louisiana Holdings") is a limited liability company organized and existing under the laws of Louisiana with its principal place of business located in Baton Rouge, Louisiana.  New Louisiana Holdings is a borrower under the Credit and Security Agreement (Revolving Credit and Term Loan), dated January 18, 2006 (the "Operating Loan").

2.     Fountain View 215 Tenant LLC ("Fountain View Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Springhill, Louisiana.  Fountain View Tenant is a borrower under the Operating Loan.

3.     Jackson Manor 1691 Tenant LLC ("Jackson Manor Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Jonesboro, Louisiana.  Jackson Manor Tenant is a borrower under the Operating Loan.

4.     Panola 501 GP LLC ("Panola Owner") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Carthage, Texas.  Panola Owner is a borrower under the Operating Loan.

5.     Retirement Center 14686 Tenant LLC ("Retirement Center Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana.  Retirement Center Tenant is a borrower under the Operating Loan.

6.     Acadian 4005 Tenant LLC ("Acadian Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana.  Acadian Tenant is a borrower under the Operating Loan.

7. Lakewood Quarters Rehab 8225 Tenant LLC ("Lakewood Quarters Rehab Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Lakewood Quarters Rehab Tenant is a borrower under the Operating Loan.

8. Regency 14333 Tenant LLC ("Regency Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Regency Tenant is a borrower under the Operating Loan.

9. Sherwood 2828 Tenant LLC ("Sherwood Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Sherwood Tenant is a borrower under the Operating Loan.

10. Lakewood Quarters Assisted 8585 Tenant LLC ("Lakewood Quarters Assisted Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Lakewood Quarters Assisted Tenant is a borrower under the Operating Loan.

11. Panola 501 Partners LP ("Panola Partners") is a limited partnership organized and existing under the laws of Texas with its principal place of business located in Carthage, Texas. Panola Partners is a borrower under the Operating Loan.

12. Citiscape Out Parcel Tenant LLC ("Citiscape Out Parcel") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Citiscape Out Parcel is a borrower under the Operating Loan.

13. Citiscape 5010 Tenant LLC ("Citiscape Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. Citiscape Tenant is a borrower under the Operating Loan.

14. St. Charles 1539 Tenant LLC ("St. Charles Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Baton Rouge, Louisiana. St. Charles Tenant is a borrower under the Operating Loan.

15. Woodland Village 5301 Tenant LLC ("Woodland Village Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in New Orleans, Louisiana. Woodland Village Tenant is a borrower under the Operating Loan.

16. Atrium 6555 Tenant LLC ("Atrium Tenant") is a limited liability company organized and existing under the laws of Delaware with its principal place of business located in Metairie, Louisiana. Atrium Tenant is a borrower under the Operating Loan.

17. Harris Schwartzberg is an individual residing in New York. Harris Schwartzberg is a signatory to a number of the agreements at issue in this litigation, including the Guaranty of Non-Recourse Carveouts Agreement and Amended and Restated Payment Guaranty (together, the "Guaranty Agreements").

## B.     **Defendants**

18. GE Financial is a corporation organized and existing under the laws of Tennessee, with its principal place of business located in Bethesda, Maryland. It can be served through its registered agent, CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, Tennessee 37929. GE Financial is a lender and the Administrative Agent under both the Operating Loan and the Credit and Security Agreement, dated January 18, 2006 (the "Term Loan").

19.     GE Healthcare Financial Services, Inc. ("GE Healthcare") is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Bethesda, Maryland.   It can be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.   GE Healthcare has interfered with the operations and healthcare services provided by the licensed healthcare facilities at issue in this litigation.

20.     General Electric Capital Corporation ("GE Capital") is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Norwalk, Connecticut.   It can be served through its registered agent, CT Corporation System, Corporation Trust Center, 111 Eighth Avenue, New York, New York 10011.   GE Capital is the parent entity of GE Financial and GE Healthcare, and is the GE healthcare lending and equipment lease financing entity.   GE Capital has interfered with the operations and healthcare services provided by the licensed healthcare facilities at issue in this litigation.

21.     CIT Healthcare LLC ("CIT") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located in New York, New York.   It can be served through its registered agent, CT Corporation System, 111 Eighth Avenue, New York, New York 10011.   CIT is a lender on both the Term Loan and Operating Loan.   CIT failed to restrain the abusive and illegal conduct of its administrative agent, GE Financial.

22.     Marathon Structured Finance Fund, L.P. ("Marathon") is a corporation organized and existing under the laws of Delaware, with its principal place of business located in New York, New York.   It can be served through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.   Marathon is a lender on both

the Term Loan and Operating Loan. Marathon failed to restrain the abusive and illegal conduct of its administrative agent, GE Financial.

23.     Richard Arrowsmith ("Arrowsmith") an individual residing at 16510 Sugarland Road, Boyds, Maryland 20841, is the Senior Vice President, Special Assets Group, of GE Capital, Healthcare Financial Services, and can be served at the corporate offices of his employer at 2 Bethesda Metro Center, Suite 600, Bethesda, Maryland 20814. Arrowsmith committed tortious acts against Plaintiffs in connection with the administration of both the Term Loan and Operating Loan.

### III.

### JURISDICTION AND VENUE

24.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) and pursuant to the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* The Court has supplemental jurisdiction over Plaintiffs' pendant state law claims pursuant to 28 U.S.C. § 1367.

25.     Defendants Marathon and CIT are subject to personal jurisdiction in the State of New York pursuant to N.Y. C.P.L.R. §§ 301 and 302. Both Marathon and CIT have their respective principal places of business in the State of New York, systematically and continuously do business in the State of New York, and have transacted business from which Plaintiffs' claims arise in the State of New York.

26.     Defendants GE Financial, GE Healthcare, GE Capital, and Arrowsmith are subject to personal jurisdiction in the State of New York pursuant to N.Y. C.P.L.R. §§ 301 and 302. They systematically and continuously do business in the State of New York and have transacted business from which Plaintiffs' claims arise in the State of New York.

27.     Defendants are also subject to personal jurisdiction under the New York long-arm statute because they have contracted and are contracting to supply or render services in the state, and have committed and are committing tortious acts within and without the state that have caused and continue to cause injury to Plaintiffs within the state.

28.     Defendants have sufficient minimum contacts with the State of New York such that there was fair warning that Defendants may be haled into court in the State of New York.  In addition, the claims arose out of or were related to Defendants' contacts with the State of New York.  Moreover, it is reasonable and does not offend traditional notions of fair play and substantial justice to require Defendants to litigate in the State of New York.

29.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York because, among other things, a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district.

## IV.

## FACTUAL BACKGROUND

**A.     The Schwartzbergs:  An American Success Story.**

30.     Albert Schwartzberg grew up in Westwood, New Jersey, the son of a Russian immigrant candy store-owner.  In the 1960s, he entered the real estate business, and throughout the ensuing forty years, became known as a skilled real estate investor.  A family man, Albert has two children, the youngest of which, Harris Schwartzberg, joined the family business during the 1990s. Together, father and son successfully completed numerous commercial real estate investment projects.

31.     Their success as real estate investors has, however, always taken a back seat to Albert and Harris' ultimate passion:  the creation of a network of skilled nursing and assisted living facilities located throughout the United States.

32. For the past twenty years, the Schwartzbergs have emphasized the importance of quality service in the nursing and healthcare industry. Rather than acquiring properties solely for their underlying real estate value, the Schwartzbergs, through their affiliates, purchased nursing and assisted living facilities with the intent of improving the experience of the residents.

33. Each of the facilities affiliated with the Schwartzbergs are operated through companies, led by qualified, licensed professionals who hire, train, and maintain, the best available nurses, managers, and administrators. Each of the facilities implements quality control practices tailored to the specific needs of each community, facility, and resident. By taking a long-term view regarding their investment in each facility, the Schwartzbergs have proven that providing the best possible care for the thousands of seniors who reside in their facilities is a successful investment strategy. Today, through their affiliated entities, the Schwartzbergs own one of the country's largest and most respected family-owned networks of skilled nursing care facilities.

**B.** **The Schwartzbergs' Expansion Into Louisiana.**

34. During the summer of 2005, the Schwartzbergs were negotiating with the lender group to acquire a portfolio of skilled nursing and assisted living facilities. Unfortunately, before the deal could be finalized, one of the most devastating natural disasters to hit the United States pummeled Louisiana.

35. On August 23, 2005, Hurricane Katrina made landfall in southeast Louisiana near New Orleans, causing $81 billion in property damage and the loss of more than 150,000 jobs. Approximately 90 percent of the residents of southeast Louisiana evacuated to escape the storm surge that extended more than six miles inland, inundating coastal communities. Katrina hit small businesses especially hard. Motivated to help, the Schwartzbergs provided evacuation plans to the operators of the facilities the Schwartzbergs hoped to acquire.

36. Of course, Katrina caused significant issues in connection with the Schwartzbergs' planned acquisition. Three of the facilities targeted for acquisition were destroyed. Moreover, the hurricane permanently altered the state's demographics. Many of the evacuees were of Louisiana's working class citizens and, thus, represented a loss of potential Medicaid patients. Once evacuated, many of them never returned to southeast Louisiana.

37. Katrina also substantially reduced the pool of medical professionals and other key staff available to work at the facilities. Naturally, as the pool of potential staff dried up, the competition for them increased. Thus, to attract potential employees in the post-Katrina environment, it was imperative that the facilities be well maintained, professionally managed, and committed to running first-class operations.

38. Given the myriad of new challenges confronting them, the Schwartzbergs could have walked away altogether. Instead, the Schwartzbergs met with the lender group and committed to restructure "the deal" with the express understanding by both sides that the volatile Louisiana economy would require flexibility relating to the acquisition, the financing, and the ongoing lender-debtor relationship.

39. Thereafter, the Schwartzbergs and the lenders restructured the acquisition by, among other things, substituting new healthcare facilities for those that had been destroyed by Katrina. Hence, at a time when Louisiana desperately needed new capital and investment, the Schwartzbergs expanded their business into the area of Louisiana hit hardest by Katrina.

1. **The financing and structure of the acquisition.**

40. On January 18, 2006, Plaintiffs acquired the right to operate twelve skilled nursing and assisted living facilities (collectively, the "Licensed Locations"),[2] as well as several ancillary healthcare-related businesses.[3] Nearly all of the Licensed Locations are in Louisiana and licensed by the Louisiana Department of Health and Hospitals ("DHH").[4]

41. Two loans were used to effect the acquisition of the Licensed Locations—the Term Loan and the Operating Loan (together, the "Loan Agreements"). Merrill Lynch, Defendant CIT, and Defendant Marathon were the original lenders under the Loan Agreements.

42. The Term Loan was for $44,250,000 in principal. The borrowers under the Term Loan (the "Term Borrowers") are the title holders and lessors of the real estate and physical properties associated with the Licensed Locations. The Term Loan proceeds were used to purchase the real estate and physical assets of the Licensed Locations. The Term Loan is secured by those real estate and physical assets. The Term Borrowers lease the Licensed Locations to the corporate Plaintiffs and are not otherwise affiliated with the Schwartzbergs or

---

[2] The Licensed Locations include Panola Nursing Home, in Carthage, Texas; Acadian Rehab and Nursing Center, in Baton Rouge, Louisiana; Lakewood Quarters Rehab Nursing Center, in Baton Rouge, Louisiana; St. Charles Health Care, in New Orleans, Louisiana ; Jackson Manor Nursing Home, in Jonesboro, Louisiana; Lakewood Quarters Retirement Community, in Baton Rouge, Louisiana; The Atrium at Lafreniere, in Metairie, Louisiana; Regency Place Care Center, in Baton Rouge, Louisiana; Woodland Village Health Care, in New Orleans, Louisiana; Sherwood Manor Rehabilitation, in Baton Rouge, Louisiana; The Retirement Center in Baton Rouge, Louisiana; and Fountain View Care & Rehab Center, in Springhill, Louisiana. St. Charles Health Care, Woodland Village Health Care, and Acadian Rehab and Nursing Center were acquired on March 15, 2006, after the initial acquisition. Lakewood Retirement accepts payments from Medicare and Medicaid; the Atrium does not accept payments from either Medicare or Medicaid; and the other ten Licensed Locations accept entitlement payments from Medicaid only.

[3] Specifically, Plaintiffs acquired interests in National Pharmacy Acquisition, LLC; Life Source Services Hospice; Pinnacle Home Healthcare; Emerald Health Care; and Elite Rehabilitation. Also acquired was a leased apartment building.

[4] Panola, located in Carthage, Texas, is the only facility not located in Louisiana.

the corporate Plaintiffs. Under the leases and other agreements executed in connection with the acquisition of the Licensed Locations, the corporate Plaintiffs were responsible for making rental payments to the Term Borrowers in an amount sufficient to cover the Term Borrowers' obligations under the Term Loan. The rent payments owed by the corporate Plaintiffs to the Term Borrowers under the various lease agreements of the Licensed Locations are paid directly to the Lenders to satisfy the obligations of the Term Loan.

43.     The Operating Loan memorializes two loan facilities: (1) a multi-year loan for $14,000,000 in original principal; and (2) a revolving credit loan having an initial commitment of $8,000,000. The corporate Plaintiffs are the borrowers under the Operating Loan (the "Operating Borrowers"), the lessees, and the licensed operators of the Licensed Locations. Plaintiff New Louisiana Holdings is the named representative for the Operating Borrowers under the Operating Loan. The Operating Loan is non-recourse.

44.     Despite having different borrowers, the Loan Agreements are interrelated in a number of ways. The Loan Agreements were executed simultaneously as part of a single business transaction. The consortium of lenders is the same on both Loan Agreements. Moreover, the Operating Borrowers, the Term Borrowers, and the original lenders contemporaneously executed the Cross-Collateralization, Cross-Default and Cross-Guaranty Agreement ("Cross-Default Agreement"), which provides that a default under the Term Loan is deemed to be a default under the Operating Loan, and vice-versa. Accordingly, a monetary default of the Term Loan could, in effect, deprive Plaintiffs of approximately $30 million in invested capital and significant "sweat equity" relating to the Licensed Locations.

## 2.  The Loan Agreements grant discretion—to be exercised in good faith—to the Administrative Agent.

45.     At the time the Loan Agreements were executed, the Louisiana economy was reeling from Hurricane Katrina.  Thus, the parties to the Loan Agreements specifically agreed that, although the lenders—in particular, the Administrative Agent—would be afforded certain discretion relating to the administration of the loans, that discretion would be exercised in a cooperative and good faith manner.  This agreement was of utmost importance to Plaintiffs in light of the economic challenges faced in Louisiana.

46.     There are several sections in the Loan Agreements that place discretion in the Administrative Agent.  For example, Section 2.2(a)(iv) of the Operating Loan provides that each "Borrower...hereby authorizes Administrative Agent to make Revolving Loans on behalf of Revolving Lenders, at any time in its sole discretion...."  Section 2.2(a)(v) provides that Administrative Agent may, from time to time, exercise its "good faith credit judgment and discretion" to increase or decrease the funds available for borrowing.  Section 2.2(a)(vi) provides that Administrative Agent may "in its discretion" apply percentages known as "liquidity factors" to adjust the amount of funds available to be borrowed...using Administrative Agent's good faith credit judgment."

47.     The Loan Agreements also grant the Administrative Agent significant financial control over the revenues earned by the corporate Plaintiffs.  For example, Section 2.12 of the Term Loan requires that all rents and other payments due under any operating lease be deposited directly into the "Payment Account," which is controlled exclusively by the Administrative Agent.  The Administrative Agent may then, in its discretion, apply those deposits to satisfy amounts owed, including payments of principal and interest, and to fund certain reserve accounts.

48.     Similarly, Section 2.12 of the Operating Loan provides for the creation and maintenance of certain "lockbox accounts."  Subject to certain exceptions, each Operating Borrower must ensure that all collections are deposited directly into the applicable lockbox account.  The Administrative Agent then "sweeps" each lockbox account on a daily basis by transferring the funds on deposit into the Administrative Agent's exclusively controlled Payment Account.

49.     For the first two years after the loans were in place, there were no significant disputes, disagreements, or issues regarding the parties' respective performances under the Loan Agreements.  In particular, Merrill Lynch, as the original Administrative Agent under both Loan Agreements, exercised its discretion in conformity with the expectations of the parties and the requirements of good faith and fair dealing.

## C.     GE Financial Replaces Merrill Lynch And Appoints Arrowsmith—An Individual Consumed By Anti-Semitic Animus.

50.     On December 26, 2007, GE Financial acquired Merrill Lynch's healthcare financing business and, as a result, assumed Merrill Lynch's position as both lender and Administrative Agent under the Loan Agreements.  Thus, the lenders under the Loan Agreements became GE Financial, CIT, and Marathon (the "Lenders").

51.     Upon assuming the Administrative Agent role, GE Financial appointed Defendant Richard Arrowsmith, Senior Vice President, Special Assets Group, to be the person responsible for administering the loans and acting as the liaison with borrowers.  If Plaintiffs had known about Arrowsmith's family history, they might have anticipated Arrowsmith's prejudices and taken steps to protect themselves and their businesses.  Unfortunately they did not.  Arrowsmith is related to the infamous mega-millionaire Harold Noel Arrowsmith, the most notorious and aggressive anti-Semite in our country's history.  In 1958, Harold Noel Arrowsmith co-founded

the political organization known as the "National Committee to Free America from Jewish Domination"—a group known for organizing anti-Semitic protests outside the White House during Dwight D. Eisenhower's administration.

52.     A year later, Harold Noel Arrowsmith became the chief financial backer of the American Nazi Party—the first political organization in the postwar United States to openly use Nazi symbols, including swastika-emblazoned flags, and to publicly defend the fascist regime of Adolf Hitler.  As the Schwartzbergs would come to realize, the anti-Semitism in the Arrowsmith clan did not stop with Harold Noel Arrowsmith, but runs through Richard Arrowsmith as well.

53.     During the next three years, GE Financial—by virtue of the unrestrained behavior of Arrowsmith—pursued intentionally discriminatory credit practices in violation of federal and Illinois State law.

**D.     Motivated By His Intense Prejudice Toward Jews, Arrowsmith Determines To Damage The Schwartzbergs And Their Businesses.**

54.     From the beginning of her interactions with Arrowsmith, Julie Gutzmann ("Gutzmann")—the Chief Financial Officer of the entity charged with oversight of Plaintiffs' financial operations—noticed his intense dislike for the Schwartzbergs.  This was startling to Gutzmann because Arrowsmith had never before met the Schwartzbergs.  Because Gutzmann interfaced directly with the Lenders regarding the Operating Loan, she met with Arrowsmith on a regular basis.  During their initial introduction, Arrowsmith was belligerent and hostile, directing her to review the Affirmative Covenants and Events of Default provisions of the Loan Agreements.  He specifically insisted that she read the loan documents and be familiar with all default covenants because, he warned, "I am."  This surprised Gutzmann given that the loans were not in default and Gutzmann had just committed to Arrowsmith her full cooperation and support.

55.     Although Gutzmann was unsure of the reason for Arrowsmith's unprofessional behavior in the beginning, it was not long before Gutzmann realized the source of Arrowsmith's disdain for Plaintiffs.   After learning that Gutzmann was Catholic like himself, Arrowsmith ceased hiding his anti-Semitic feelings toward the Plaintiffs—repeatedly making disparaging and bigoted remarks about the Schwartzbergs.   At the end of one particularly fateful conversation, Arrowsmith declared to Gutzmann that the Schwartzbergs should prepare for changes because during his administration of the loans life was going to be drastically different for the Schwartzbergs than it was under Merrill Lynch.   Arrowsmith thereby served notice that he intended to make life difficult for the Schwartzbergs.

### E.     Bigotry In Action:  Arrowsmith Takes Affirmative Steps To Damage Plaintiffs.

56.     On May 6, 2008, Arrowsmith followed through on his warnings to Gutzmann and manufactured a default on the Operating Loan.   Specifically, GE Financial declared that the Operating Borrowers had not maintained a "Fixed Charge Coverage Ratio" less than 1.5 and a "Consolidated Leverage Ratio" less than 5.0, as required by Sections 6.2 and 6.3 of the Operating Loan.[5]

---

[5] The Operating Loan defines "Fixed Charge Coverage Ratio" as fixed charges, including, but not limited to, interest expense, net of interest income, interest paid in kind, and amortization of capitalized fees and expenses, plus any provision for (or less any benefit from) income or franchise taxes. "Consolidated Leverage Ratio" is defined in the Operating Loan as the ratio of funded debt to EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization), as calculated for three calendar months.

57.     In addition, Arrowsmith declared a default of the Term Loan because, under Section 6.2, the "Debt Yield Percentage"[6] maintained by Term Borrowers had allegedly risen above 14%.

58.     At the time that Arrowsmith declared the loans to be in default, the physical assets of the Licensed Locations were acceptable, the occupancy levels in the housing facilities were improving, and the businesses were operating positively. Importantly, there had been no monetary defaults—that is, Operating Borrowers had timely made all principal and interest payments to Lenders. Thus, to the extent defaults existed, they were technical, non-monetary, immaterial, and could have been easily cured.

59.     Given that the Operating Borrowers had just completed two years recruiting staff, marketing the facilities, and operating the portfolio in a region that was fighting to revive itself after the economic impact of Hurricane Katrina. It is clear that Arrowsmith's conduct was the result of a desire to drive Plaintiffs into default, a fact he later admitted. Then, within twenty-four hours of declaring the defaults, Arrowsmith dramatically decreased the amount of funds available to be borrowed. In addition, he caused GE Financial to begin assessing an additional $5,000 fee each time that Operating Borrowers withdrew funds from the Operating Loan. Because all of the funds necessary to provide suitable care for the elderly residents are swept from the related lockbox into a Payment Account controlled by the Administrative Agent, the above changes caused a sudden decrease in liquidity and unreasonably impaired the operations of the Licensed Locations.

---

[6] The "Debt Yield Percentage," as defined under the Term Loan, means the ratio of Net Operating Income to the average outstanding balance of the Term Loan, plus the average outstanding balance of the Housing and Urban Development (HUD) Debt.

60. On May 8, 2008, Gutzmann wrote to Arrowsmith and requested that Arrowsmith provide Plaintiffs with the audit that allegedly supported the change in the liquidity factors. This information was important to enable Plaintiffs to effect a cure of any such default. Gutzmann also objected to the fact that GE Financial had implemented the change without providing the ten-day notice required under Section 2.2 of the Operating Loan.

61. Incredibly, Arrowsmith refused, saying, "We don't provide our field tests to Borrowers" and that the liquidity factors were now subject to change without notice because both loans were now "in default." That fact, Arrowsmith declared, gave him unfettered control over the Licensed Locations and the Schwartzbergs would have to get used to it.

62. Then, in June 2008, without providing prior notice, Arrowsmith further reduced the amount of funds available for borrowing from the line of credit by again increasing the required reserves. This increased reserve, along with the adjustment in liquidity reserves, reduced the Operating Borrowers' access to their accounts receivable to a mere fifty-eight percent of available Medicare and Medicaid funds.

63. During the next year, Gutzmann tried in vain to convince Arrowsmith that his actions were damaging the collateral for the loans. It was during these numerous interactions that Arrowsmith openly conveyed his anti-Semitic bias against the Schwartzbergs and their businesses. Arrowsmith declared that he was purposely reducing the Operating Borrowers' access to funds at every level regardless of its impact on the operations of the Licensed Locations. During these conversations, Arrowsmith asked Gutzmann on numerous occasions why she—an experienced professional—worked for "those people."

64. Arrowsmith displayed the animus which motivated his discriminatory actions by word and deed on numerous occasions. For example, at the commencement of one "all hands"

meeting, Arrowsmith inquired of Gutzmann if the Schwartzbergs brought more than one attorney to meetings to cover their white-collar crimes and another lawyer to handle the civil matters.

65. Over time, Gutzmann understood that Arrowsmith had no intention of administering the Loan Agreements in good faith, but instead was intent on wreaking havoc on all that the Schwartzbergs had created. In fact, he admitted that to Gutzmann on more than one occasion.

66. In the coming months, Arrowsmith's heavy-handed approach to the administration of the loans became all-too-familiar to Plaintiffs. Time and again, Arrowsmith's anti-Semitism motivated him to implement discriminatory loan policies and to exercise the discretion given under the loan documents, not in good faith, but as a way of damaging Plaintiffs given his antipathy toward them as Jews. As a result, tens of millions of dollars of value and goodwill were lost at the Licensed Locations.

F.    **Arrowsmith And GE Financial Attack The Licensed Locations At All Levels.**

67. Reducing the available funds was only one tactic employed by Arrowsmith to divert revenues from the Licensed Locations to the Lenders. Other tactics included: (1) imposing default interest rate payments; (2) needlessly increasing the amount of fees paid to GE Financial as the Administrative Agent and increasing the fees paid to the Lenders; (3) requiring the creation of new reserve accounts which were funded by Plaintiffs; and (4) stockpiling funds in escrow accounts and maintaining balances in those accounts far in excess of what was reasonable.

68. Within a month of declaring the defaults, Arrowsmith abruptly denied all requests for reimbursements of capital expenditures. Pursuant to the Term Loan, monthly payments are required to be deposited into a capital replacement reserve account (the "Capital Reserve Account"), which is controlled by the Administrative Agent. The express purpose of the Capital

Reserve Account is to reimburse costs for capital improvements made by the Licensed Locations, which include, among other things, expenditures for everything from life safety conditions to maintaining the upkeep and appearance of the facilities.

69. Throughout the course of their dealings, Gutzmann repeatedly told Arrowsmith that the reserve funds were needed to fund operations and to continue to satisfy regulatory requirements. She pleaded with Arrowsmith to release the reserve funds so they could be applied to the maintenance of items such as elevators, wheelchair access, tub rooms, and the buildings' heating and cooling systems. When Plaintiffs asked him to release those funds to purchase furniture, he responded by admitting that he improperly viewed "these reserves as additional collateral for the loans" and that the Schwartzbergs were rich "so they can take care of the buildings."

70. Thus, Arrowsmith refused to release the stockpiled funds, even though the balances in those collateral accounts far exceeded the amounts necessary. According to Arrowsmith, "We are GE—the 800 pound gorilla—we can do whatever we want." Of course, his decision had the effect of undermining the value of the Licensed Locations.

71. At a time when Plaintiffs could ill afford such reckless abuse of the discretion held by the Lenders, Arrowsmith was withholding millions of dollars needed for capital expenditures. And, as if to add insult to injury, when Arrowsmith traveled to New York City to meet with Plaintiffs, he required them to reimburse his travel expenses, including his accommodations at the Ritz-Carlton Hotel.

72. Clearly, Arrowsmith's conduct bore no rational connection to sound lending practices. Rather, his conduct was borne, as Gutzmann knew, of his animus toward the Schwartzbergs' ethnicity and religion.

73.     Indeed, other individuals within the consortium of lenders recognized Arrowsmith's hostility toward Plaintiffs was irrational and counterproductive. In fact, the CEO of one of the lenders stated that, in his opinion, Arrowsmith's actions were motivated by anti-Semitism.

74.     However, when Plaintiffs notified Defendants in writing that Arrowsmith's irrational bias was motivating conduct which was damaging the collateral for their loans by negatively impacting the operations at the Licensed Locations, Defendants did nothing to control him. In fact, Defendants' acquiescence emboldened Arrowsmith to continue discriminating against Plaintiffs in connection with the administration of the Loan Agreements.

**G.     As A Result Of Arrowsmith's Conduct, Civil Penalties Are Assessed Against The Licensed Locations.**

75.     By the end of 2008, many of the Licensed Locations required additional funding to satisfy regulatory requirements. The Licensed Locations also needed funding to hire additional staff, purchase supplies, and repair or replace broken or obsolete equipment.

76.     Nevertheless, Arrowsmith refused to release sufficient funds for Plaintiffs. Thus, to sustain operations and continue to meet payroll, Plaintiffs were forced to fund the Licensed Locations from other, unrelated businesses which were indirectly owned by the Schwartzbergs. This was necessary because, as described above, substantially all of Plaintiffs' receipts were "swept" on a daily basis into accounts that were under the exclusive control of Arrowsmith. When Gutzmann informed Arrowsmith that Plaintiffs could not continue to over-fund the Licensed Locations from other sources, his response was, "Too bad!"

77.     Predictably, Arrowsmith's withholding of funds earmarked for capital improvements and other expenses (as well as his decision to levy additional penalties and fees against Operating Borrowers) eventually left Plaintiffs unable to operate the Licensed Locations

in a manner consistent with their traditional practices. As Plaintiffs had repeatedly warned Arrowsmith, the Licensed Locations experienced an increase in resident complaints, which ultimately led to the Centers for Medicare & Medicaid Services ("CMS") making citable findings in both complaint and annual surveys.[7] As a result, the reputations of the Licensed Locations were irreparably damaged within their respective communities and Plaintiffs were forced to incur millions of dollars in expenses to manage the survey process, pay fines and penalties, and refund CMS for services provided during the penalty period (commonly referred to as a "clawback remedy").

78.     These financial penalties would have been avoided if Defendants had released funds required to complete capital improvements and had not interfered with the ability of the operators to provide proper care.

79.     In total, between December 2008 and May 2010, the DHHS assessed approximately $600,000 in civil monetary penalties and denials of payment penalties on the Licensed Locations. Matters became substantially worse, however, in June 2010, when the DHHS levied an additional $200,000 penalty against the Sherwood facility based on the results of a regulatory inspection.

80.     All of the violations cited were attributable to GE Financial's interference with the staff at the Licensed Locations and Arrowsmith's refusal to make funds available to the Operating Borrowers for capital expenditures—funds that had been deposited by Operating

---

[7] CMS is the federal agency within the United States Department of Health and Human Services ("DHHS") charged with administering the Medicare program and works in partnership with state governments to administer Medicaid. Established in 1965, the Medicaid program is designed to provide medical benefits to certain groups of low-income people. The Medicaid program is jointly administered by the federal and state governments pursuant to the Medicaid Act, 42 U.S.C. § 1396. Louisiana is a participant in the Medicaid program and administers its program pursuant to a state plan, administered by the Louisiana Department of Health and Hospitals.

Borrowers into a reserve account specifically for that purpose. Arrowsmith intentionally made it impossible for the Operating Borrowers to operate the Licensed Locations in a manner that would allow the Licensed Locations to realize their potential and compete in their respective markets.

81.    Instead of releasing reserve funds to address the regulatory deficiencies, Arrowsmith and GE Financial responded by withholding *even more funds*. On June 8, 2010, Arrowsmith and GE Financial notified Gutzmann that the "CMP & Medicaid Claw Back Reserve" was being increased from $42,000 to $655,000, effective immediately. During that conversation Arrowsmith indicated his lack of concern for the potential adverse effect that the lack of funding would have on the health and safety of the residents.

82.    In an effort to curb Arrowsmith's actions, Harris Schwartzberg contacted Darren Alcus ("Alcus"), GE Financial's President of Commercial Finance, whom he had met in connection with unrelated business interests. Schwartzberg hoped that Alcus would cause GE Financial to exercise some oversight and require Arrowsmith to act rationally when administering the loans.

83.    Thus, Harris wrote to Alcus, notifying him that the "situation at the property level continues to worsen given the fact that we do not have access to our [capital] although we continue to fund into the reserve," and the "lack of capital is especially problematic given the fact that we're in summer ... and continue to have dangerous heat related building problems that cannot be addressed because we do not have our funds available." Despite having thus been directly informed of the situation, Alcus refused to override Arrowsmith's decisions.

84. Of course, Alcus and Arrowsmith knew that Plaintiffs could not possibly meet these obligations when substantially all of their operating receipts were being swept into accounts under the exclusive control of GE Financial.

85. When Plaintiffs notified the other lenders, CIT and Marathon, that the problems with the Licensed Locations were related to Arrowsmith's discriminatory and heavy-handed loan practices, CIT and Marathon did nothing.

## H. GE Financial Becomes The De Facto Operator Of The Licensed Locations.

86. In addition to imposing intentionally unreasonable financial burdens on Plaintiffs and their businesses, Defendants also, directly and through subsidiaries, interfered with the clinical and operational decisions at the Licensed Locations. So pervasive was the interference that they became the de facto operators of the Licensed Locations.

87. Soon after GE Financial acquired the loans, representatives from GE Healthcare and GE Capital (together, "GE Healthcare and Capital") began scheduling unnecessary clinical inspections at each of the Licensed Locations purportedly to observe their practices and procedures. It quickly became apparent that the GE Healthcare team intended to impose "improvements" and provide "guidance" as to matters that were clearly within the purview of the Operating Borrowers.

88. When Plaintiffs objected and reminded Arrowsmith that neither GE Financial nor GE Healthcare and Capital is licensed to operate or manage the Licensed Locations, he responded that the clinical inspections were mandatory and that the healthcare staff at each facility must accommodate the "GE Healthcare team." Disregarding the operating efficiencies and autonomy of each facility, GE Healthcare and Capital scheduled and conducted more than twenty on-site clinical inspections between late 2008 and April 2010.

89.     Despite the objections of Plaintiffs' managing employees and professional staff, the representatives for GE Healthcare and Capital inspected the treatment rooms, the private resident rooms, and the back offices at each facility, while also demanding access to the residents' confidential medical records.

90.     Between November 18, 2008 and March 11, 2010, GE Financial caused the staff at the Licensed Locations to spend more than 3,500 labor hours chauffeuring GE Healthcare and Capital representatives around the state—answering pointless questions, and addressing instructions and comments passed down by the bureaucrats of GE Healthcare and Capital.

91.     Following each of these fee-driven, on-site clinical inspections, GE Healthcare and Capital representatives advised and instructed the professionals employed at the Licensed Locations how each facility should be operated and managed. In fact, GE Healthcare and Capital representatives even sought to make decisions relating to the hiring and, in some instances, the terminating of employees. Any attempt to resist these mandates was met with more heavy-handed, disproportionate responses by Arrowsmith and GE Financial relating to the Loan Agreements.

92.     The Schwartzbergs and their affiliates have been involved in the skilled nursing industry for over forty years and have <u>never</u> experienced this type of intrusive, unauthorized behavior by any lender. In fact, when Plaintiffs complained that the "GE Team" was interfering with the operations of the Licensed Locations, Arrowsmith candidly informed Plaintiffs that he viewed the exercise as income producing for the Lenders—especially GE Financial—and that he could do whatever he wanted.

**I.      GE Financial Exercises Bad Faith Regarding A Proposed Loan Modification.**

93.     Naturally, given the circumstances, Plaintiffs invested significant effort in attempting to modify the loans in order to replace Lenders with a new financing source.

Plaintiffs were repeatedly led to believe by GE Financial that signatures would be forthcoming on various proposed loan modifications only to have GE Financial repeatedly withdraw its consent without explanation. Defendants, through Arrowsmith, summarily rejected each of Plaintiffs' proposals.

94. For example, in September 2009, Gutzmann approached Arrowsmith at the National Investment Conference ("NIC") in Chicago, to restart conversations on yet another failed loan modification agreement. Arrowsmith responded to the overture by stating that he intended to conduct an "assault" on the Schwartzbergs. Arrowsmith stated that he would first "repossess their cars so their children would have no way to get to their private schools," then he would "foreclose on their houses since the laws in New York do not provide protection for primary residences."

95. Previously, in March 2009, Plaintiffs sought Lenders' permission to restructure Plaintiffs' ownership interests in the ancillary businesses (*e.g.*, the home health business, the pharmacy, and the therapy business) so that the overall portfolio of assets would become more attractive for purposes of refinancing the loans and raising investment proceeds.[8] In particular, Plaintiffs explained to GE Healthcare and the Lenders that due to pending changes in reimbursement formulae, the EBITDA of the home health business would likely decline by as much as 50% within the ensuing twelve months and, therefore, it made business sense to divest Plaintiffs' equity interest in Pinnacle Home Healthcare immediately. In addition, Plaintiffs explained that they could receive as much as $1 million of withheld distributions from the pharmacy business by completing the proposed transaction. Plaintiffs also explained various

---

[8] Specifically, Plaintiff New Louisiana Holdings would divest its interests in Pinnacle Home Healthcare and National Pharmacy Acquisition, LLC, in exchange for a 100% interest in Elite Rehabilitation.

concerns regarding the pharmacy and whether the value of the minority interest in the pharmacy would be able to command the same value if the ancillary deal was delayed. After considerable discussions, Arrowsmith arbitrarily withheld GE Financial's consent to the proposed transaction unless it also involved a modification to the Operating Loan.

96. Therefore, Plaintiffs and Lenders entered into negotiations with the Lenders to modify the Operating Loan. Indeed, Plaintiffs proposed a solution that would pay down a portion of the outstanding balances on the loans. Their goal was to provide enough liquidity to enable the Licensed Locations to operate and permit Plaintiffs to restructure their ownership interests in the ancillary businesses.

97. In late December 2009, after months of negotiation, Arrowsmith notified Plaintiffs that GE Financial was no longer interested in considering a loan modification, opting instead to continue collecting exorbitant loan fees and default interest rate payments, while stockpiling excessive balances in the collateral reserve accounts. When asked why GE Financial would not give its consent, which Plaintiffs explained was critical to being able to refinance the portfolio, Arrowsmith admitted to Gutzmann that "while we think the deal makes sense," he was not willing to approve it because it gave "too much benefit to the Schwartzbergs."

98. It has since been discovered that while Plaintiffs were making their principal and interest payments to GE Financial and attempting in good faith to negotiate a loan modification, Arrowsmith was slandering Plaintiffs to others with whom Plaintiffs sought to do business by referring to them as the "worst operators in GE's portfolio."

99. GE Financial has required Plaintiffs to pay millions of dollars in undocumented and unsubstantiated attorneys' fees relating to GE Financial's purported consideration of the proposed loan modification. In addition, all of Plaintiffs' fears regarding the ancillary

businesses have been realized: (1) the EBITDA of the home health business is down by 50% and is embroiled in litigation; (2) the pharmacy income has decreased to almost zero, litigation has commenced and more than $1 million of distributions due to affiliates of the Plaintiffs is being withheld; and (3) the ancillaries transaction is no longer an option.

100.    Defendants' arbitrary refusal to consent to Plaintiffs' proposed ancillary business transactions and loan modifications has substantially damaged Plaintiffs. In December 2008, Plaintiffs could have obtained refinancing in the amount of $32.2 million (a 30% discount from the outstanding balance of the loans). Since that time, the value of the portfolio has declined to the point that the Licensed Locations barely support basic commercial credit today.

## J.    GE Financial Refuses To Properly Account For Millions Of Dollars Of Charges.

101.    Since the time that GE Financial declared the loans to be in technical default and began charging penalties and extra fees, including charges for Lenders' counsel, Plaintiffs have repeatedly requested that GE Financial provide an accounting to justify those charges. Among other things, Plaintiffs requested that GE Financial disclose its calculations, methodologies, and bases for reducing the funds available for borrowing. Incredibly, GE Financial has refused to do so.

102.    In addition, requests have been submitted to GE Financial's counsel on a number of occasions seeking a full accounting for the management, administration, and handling of all payments, deposits, accounts, and other funds received and disbursed under the Loan Agreements, which again amounts to millions of dollars. Defendants have refused to do so.

103.    In sum, GE Financial has routinely diverted funds from Plaintiffs' operating revenue to satisfy amounts purportedly owed for interest, principal, and other loan-related fees, including attorneys' fees and reimbursement of putative travel and other expenses. GE Financial has refused, however, to account for those transactions by producing the documentary backup.

104.   GE Financial has also produced conflicting account statements that fail to properly reflect the amount of funds swept from deposits into the various accounts, under the exclusive control of Defendants.

**K.**   **The Damage Done**

105.   Defendants failed to restrain Arrowsmith's plainly unreasonable conduct as described above. They failed to do so despite knowing that the conduct violated the Lenders' obligations of good faith and fair dealing. Worse still, they did so despite having been informed of Arrowsmith's repeated anti-Semitic comments and apparent motives. Therefore, Defendants are legally responsible for the intentional, discriminatory scheme relating to the administration of the Loan Agreements that Arrowsmith admitted was designed to cause substantial harm to the Schwartzbergs and their businesses.

106.   Among other things, Defendants caused Plaintiffs' businesses to sustain millions of dollars in operating losses, lose tens of millions of dollars in value and goodwill relating to the Licensed Locations, and caused Plaintiffs to invest an additional $30 million into the Licensed Locations. The combined effect of these actions damaged not only the Licensed Locations but the reputation of New Louisiana Holdings as an operator, as well as the Schwartzbergs and their other affiliated healthcare businesses.

107.   Motivated by animus toward the Schwartzbergs because of their Jewish heritage, Arrowsmith told Gutzmann that the Licensed Locations would, in his opinion, never generate enough profits to cover the debts owed under the Loan Agreements. He, therefore, intended to use his discretion under the Loan Agreements to seize total control over their finances and to squeeze "those people" for as much in fees as he could.

108.   Instead of administering the Loan Agreements in good faith, Defendants have wrongfully: (1) diverted Plaintiffs' operating revenues to themselves; (2) withheld available

reserve funds in accounts having balances far in excess of the amounts needed; (3) applied default interest rates; (4) collected excessive administrative and loan-related fees; (5) created new reserve accounts which they required Plaintiffs to fully fund; and (6) imposed oppressive and overly burdensome reporting requirements.

109. As a result of those willful and wrongful acts, Defendants have damaged Plaintiffs and caused the Licensed Locations to fall into disrepair. Consequently, the Licensed Locations have become subject to governmental regulatory penalties and negative media publicity.

110. Defendants have destroyed the goodwill previously associated with the Licensed Locations and made it difficult for Plaintiffs to recruit, hire, retain, and develop qualified professionals to properly staff the Licensed Locations. These numerous acts of bad faith have caused occupancy levels at the Licensed Locations to plummet, and certain suppliers and vendors to refuse to do business with the Licensed Locations.

111. To sustain operations, Plaintiffs have been required to inject more than $50 million to operate the Licensed Locations—which would not have been necessary if Defendants had not engaged in race-based bias and otherwise willful, tortious, bad faith conduct aimed at diverting funds away from the operations of the business and into the pockets of the Lenders.

## V.

## CLAIMS

### A. Count One: Violation Of 42 U.S.C. § 1981

112. Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

113. Each of Operating Borrowers is a legal entity that has acquired a racial identity with a minority group protected by the safeguards of 42 U.S.C. § 1981.

114. Defendants intentionally discriminated against Operating Borrowers on the basis of their racial identity.

115. Defendants' clear history of discrimination towards Operating Borrowers concerns the performance and modification of the Loan Agreements as well as the enjoyment of the benefits, privileges, terms, and conditions of the contractual relationships between Operating Borrowers and Lenders. Defendants discriminated against Operating Borrowers on the basis of their Jewish identity with respect to the Loan Agreements by, among other things: (1) exercising excessive and unreasonable control over Plaintiffs' business operations; (2) withholding available funds in excess of the amounts necessary to secure Lenders' interest in the Loan Agreements; (3) improperly charging Operating Borrowers penalties, fees, and Lender expenses (including attorneys' fees); (4) improperly applying loan payments and other funds belonging to Operating Borrowers; (5) requiring the creation and funding of new reserve accounts; (6) arbitrarily and in bad faith refusing to consent to Operating Borrowers' proposed business transactions; and (7) refusing to provide a proper accounting. Defendants treated others similarly situated to Operating Borrowers, but who were not members of the same racial minority, more favorably in the performance and modification of commercial loans than Defendants treated Operating Borrowers.

116. Operating Borrowers have suffered substantial injuries for which they seek compensatory damages, including, but not limited to, recovery of fees and costs incurred as a result of Defendants' unlawful actions, the diminution in value and goodwill of the Licensed Locations, and lost profits. Furthermore, Defendants acted with malice and willful intent to harm Operating Borrowers and, therefore, Operating Borrowers seek exemplary damages to the

fullest extent allowed by law. In addition, Operating Borrowers seek to recover their court costs and reasonable attorneys' fees.

**B.** **Count Two: Violation of 15 U.S.C. § 1691**

117. Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

118. Each of Operating Borrowers is a legal entity that has acquired a racial and religious identity with a minority group protected by the safeguards of 15 U.S.C. § 1691.

119. Lenders are creditors, as they regularly extend, renew, or continue credit, and regularly arrange for the extension, renewal, or continuation of credit.

120. Operating Borrowers applied to Lenders directly for an extension or continuation of credit under the Loan Agreements.

121. Despite their qualifications, Defendants discriminated against Operating Borrowers on the basis of their Jewish identity with respect to the Loan Agreements by, among other things: (1) exercising excessive and unreasonable control over Plaintiffs' business operations; (2) withholding available funds in excess of the amounts necessary to secure Lenders' interest in the Loan Agreements; (3) improperly charging Operating Borrowers penalties, fees, and Lender expenses (including attorneys' fees); (4) improperly applying loan payments and other funds belonging to Operating Borrowers; (5) requiring the creation and funding of new reserve accounts; (6) arbitrarily and in bad faith refusing to consent to Operating Borrowers' proposed business transactions and loan modifications; and (7) refusing to provide a proper accounting. Defendants treated others similarly situated to Operating Borrowers, but who were not members of the same racial minority, more favorably in the performance and modification of commercial loans than Defendants treated Operating Borrowers.

122. Operating Borrowers have suffered substantial injuries for which they seek compensatory and consequential damages, including, but not limited to, lost profits and the diminution in value and goodwill of the Licensed Locations. Furthermore, Defendants acted with malice and willful intent to harm Operating Borrowers and, therefore, Operating Borrowers seek exemplary damages to the fullest extent allowed by law. In addition, Operating Borrowers seek to recover their court costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1691e.

## C.    Count Three: Breach Of The Operating Loan

123. Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

124. At all relevant times pertinent hereto, Operating Borrowers and Lenders were parties to the valid and binding Operating Loan.

125. Operating Borrowers have satisfied all conditions precedent to the assertion of their claim against Lenders for breach of the Operating Loan. Operating Borrowers have performed all of their obligations under the Operating Loan or, in the alternative, such performance has been excused, prevented, or hindered by the wrongful acts and material breaches of contract by Lenders.

126. Pursuant to the Operating Loan, and as set forth more fully in the preceding paragraphs, Lenders were required, among other things, to: (1) exercise good faith credit judgment and discretion with respect to decisions regarding increasing or decreasing funds available for borrowing and with respect to the application of liquidity factors; (2) provide Operating Borrowers ten-days' notice before implementing a change to the fees charged for withdrawals; (3) release operating revenue to Operating Borrowers pursuant to the contract; (4) release available reserve funds to Operating Borrowers pursuant to the terms of the contract; (5)

apply the appropriate contract interest rate; and (6) collect only the administrative and loan-related fees set forth in the Operating Loan.

127. Lenders breached the Operating Loan in multiple respects, including, but not limited to: (1) failing to exercise good faith credit judgment and discretion with respect to decisions regarding increasing or decreasing funds available for borrowing and with respect to the application of liquidity factors; (2) failing to provide Operating Borrowers ten-days' notice before implementing a change to the fees charged for withdrawals; (3) failing to release operating revenue to Operating Borrowers; (4) failing to release available reserve funds to Operating Borrowers pursuant to the terms of the contract and, thereby, diverting Plaintiffs' funds to themselves; (5) improperly applying the default interest rate; and (6) improperly collecting excessive administrative and loan-related fees.

128. As a proximate result of Lenders' breaches of the Operating Loan, Operating Borrowers have incurred damages (including attorneys' fees, costs, and expenses) in an amount to be determined by the trier of fact.

**D.    Count Four:  Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

129. Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

130. Operating Borrowers have satisfied all conditions precedent to the assertion of their claim against Lenders for breach of the Operating Loan. Operating Borrowers have performed all of their obligations under the Operating Loan or, in the alternative, such performance has been excused, prevented, or hindered by the wrongful acts and material breaches of contract by Lenders.

131. By entering into the Loan Agreements with Operating Borrowers, Lenders owed Operating Borrowers, among other things, a duty of good faith and fair dealing to exercise their

contractual discretion honestly, reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

132.     Lenders breached their implied duty of good faith and fair dealing by, among other things: (1) exercising excessive and unreasonable control over Operating Borrowers' business operations; (2) withholding available funds in excess of the amounts required; (3) improperly charging Operating Borrowers penalties, fees, and Lender expenses (including attorneys' fees); (4) improperly applying loan payments and other funds belonging to Operating Borrowers; (5) requiring the creation and funding of new reserve accounts; (6) arbitrarily and in bad faith refusing to consent to Operating Borrowers' proposed business transactions; and (7) refusing to provide a proper accounting.

133.     Through their wrongful acts, Lenders have taken advantage of Operating Borrowers in a way that could not have been contemplated at the time that the Loan Agreements were executed, and caused Operating Borrowers to suffer substantial injuries for which they seek compensatory and consequential damages, including, but not limited to, lost profits and the diminution of value and goodwill. In addition, Lenders acted with malice and willful intent to harm Operating Borrowers and, therefore, Operating Borrowers seek to recover exemplary damages to the fullest extent allowed by law.

**E.    Count Five:  Action For An Accounting**

134.     Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

135.     Defendants have acted in bad faith by failing to disclose their calculations, methodologies, and other bases for:  (1) reducing the funds available for borrowing; (2) withholding funds on deposit in reserve accounts; and (3) demanding that Operating Borrowers pay excessive penalties, expenses, and other loan-related fees.

136. During the past three years, Defendants have proceeded to divert millions of dollars in capital, revenues, and profits into lockbox accounts. In addition, Defendants have produced conflicting account statements that fail to properly reflect the amount of funds swept into the various lockbox and reserve accounts, which are under the exclusive control of Defendants.

137. Operating Borrowers are entitled to an accounting because there is a need for discovery of what funds have been deposited and disbursed, and there is an absence of adequate remedy at law. The facts sought to be discovered are material and such facts are incapable of proof in a court of law and can be established only by discovery from Defendants. Discovery is indispensable to the attainment of justice.

138. Accordingly, Operating Borrowers request a full accounting regarding the management, administration, and handling of the loans, including, but not limited to, a full disclosure of all charges, penalties, receipts, deposits, accounts, and disbursements relating to the loans. Such accounting shall include, among other things, a full disclosure of the calculations, methodologies, and basis used by Lenders to determine the amounts and timing of all such loan activities.

## F. Count Six: Declaratory Judgment

139. Plaintiffs repeat and incorporate by reference the allegations set forth in the preceding paragraphs.

140. Pursuant to N.Y.C.P.L.R § 3001, this Court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of Harris Schwartzberg and Lenders. A present controversy exists between Harris Schwartzberg and the Lenders for which adequate relief is not presently available through other forms of action.

141.     Harris Schwartzberg, individually, executed the Guaranty Agreements in connection with the Operating Borrowers' execution of the Operating Loan.

142.     Defendants, however, are in breach of the Operating Loan and in violation of 42 U.S.C. §1981 and 15 U.S.C. §1691 as a result of, among other things, Defendants' discriminatory conduct against the Operating Borrowers.

143.     Harris Schwartzberg requests that the Court declare that the Operating Loan is unenforceable as a result of Lenders' breach of the Operating Loan and violation of 42 U.S.C. §1981 and 15 U.S.C. §1691 and, therefore, he is under no obligation to pay any amounts pursuant to the Guaranty Agreements.

## VI.

## REQUEST FOR RELIEF

144.     WHEREFORE Plaintiffs respectfully request that this Court enter judgment for Plaintiffs and against Defendants and award Plaintiffs the following relief:

a.     compensatory damages;

b.     consequential damages;

c.     exemplary damages;

d.     prejudgment and post-judgment interest at the appropriate rates established by law;

e.     declaratory judgment;

f.     reasonable attorneys' fees;

g.     costs of Court; and

h.     such other and further relief, at law or in equity, to which Plaintiffs may be entitled and which this Court deems just and appropriate.

Respectfully submitted,

**BICKEL & BREWER**

By: _____

William A. Brewer III (WB 4805)
Alexander D. Widell (AW 3934)
767 Fifth Avenue, 50th Floor
New York, New York 10153
Tel: (212) 489-1400

**ATTORNEYS FOR PLAINTIFFS**

5238851.47
2141-02